**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARJORIE KLEIN,

     *Plaintiff,*

       v.

METROPOLITAN LIFE INSURANCE
COMPANY; and ALLEGHENY COLLEGE
LONG TERM DISABILITY PLAN,

     *Defendants*.

Civil Action No.:  1:21-cv-260

## COMPLAINT IN CIVIL ACTION

Now comes Plaintiff, Marjorie Klein, by and through her attorneys Caroselli Beachler & Coleman, LLC and Susan A. Meredith, Esquire and files the following Complaint in Civil Action:

## PARTIES

1.    Marjorie Klein ("Plaintiff") at all relevant times was a resident of Crawford County in the Commonwealth of Pennsylvania.

2.    Defendant Metropolitan Life Insurance Company ("Defendant MetLife") is a corporation and insurance company duly organized and existing under the laws of Delaware with its principal place of business located at 200 Park Avenue, New York, NY, 10166.

3.    Defendant Allegheny College Long Term Disability Plan ("LTD Plan" or "Defendant LTD Plan") has been at all relevant times a welfare benefit plan administered under the Employee Retirement Income Security Act, 29 U.S.C. §1001 *et seq.* ("ERISA") and is a proper-party Defendant pursuant to 29 U.S.C. §1132(d)(1).

## JURISDICTION AND VENUE

4.    This is an action for equitable and legal relief brought under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.*

1

5.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §1132 (e) & (f).

6.      Venue is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(a) & (b) and 29 U.S.C. §1132(e)(2).

7.      Pursuant to ERISA and 29 U.S.C. §1133, Plaintiff is required to file an administrative or internal appeal of a long-term disability benefit denial.  Plaintiff submitted an appeal of the denial of her long-term disability benefit claim, and Defendant MetLife and/or Defendant LTD Plan upheld the determination.  This matter is ripe for judicial adjudication.

## PLAINTIFF'S PARTICIPATION IN THE LONG-TERM DISABILITY PLAN

8.      At all times relevant, Plaintiff was an employee of Allegheny College and was employed as the Senior Vice President of Development and Alumni Affairs.

9.      At all times relevant, Allegheny College is and has been the plan sponsor for the LTD Plan.

10.     At all times relevant, Defendant MetLife is and has been the claims administrator for the LTD Plan within the meaning of Section 3(16) of ERISA, 29 U.S.C. §1002(16)(A) and controlled the administration of the LTD Plan.

11.     At all relevant times, Plaintiff was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in the LTD Plan.

12.     Long term disability benefits under the LTD Plan have been insured in accordance and pursuant to Group Policy Number TM05918951–G, issued by Defendant MetLife to Allegheny College.  (A copy of group policy number TM05918951-G is attached as Exhibit A and will be referred to as the "LTD Policy.")

13.     The LTD Policy defines "disabled or disability" to mean:

due to Sickness or was a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
- during the Elimination Period and the next 24 months of Sickness or accidental injury, You are unable to perform each of the material duties of Your Own Occupation;
- after such period, You are unable to perform the duties of any gainful occupation for which You are reasonably qualified taking into account Your training, education experience.

14.     The LTD Policy defines "own occupation" as "the essential functions You regularly perform that provide Your primary source of income".

15.     The LTD Policy defines "sickness" to mean "illness, disease or pregnancy, including complications of pregnancy".

16.     The LTD Policy does not define the terms "material duties" or "gainful occupation".

## STANDARD OF REVIEW

17.     The LTD Policy and/or LTD Plan lacks the necessary language for Defendant MetLife's and/or Defendant LTD Plan's claim decisions to be granted deference.

18.     This case is subject to a *de novo* standard of review.

## MATERIAL DUTIES OF VICE PRESIDENT OF DEVELOPMENT AND ALUMNI AFFAIRS

19.     A job description for the position of Vice President of Development and Alumni Affairs dated May 26, 2016 is contained in Defendant MetLife's claim file.  (Exhibit B, May 26, 2016 job description for position of Vice President of Development and Alumni Affairs hereinafter referred to as "May 26, 2016 job description").

3

20. The May 26, 2016 job description included a position summary which stated:

> The Vice President of Development and Alumni Affairs is a member of the senior management team of the college and as such advises and supports the President and Board of Trustees in all matters of fundraising and alumni relations.

21. The May 26, 2016 job description lists the job's essential functions as:

**ESSENTIAL FUNCTIONS**

- Provide leadership for the development, execution and on-going assessment of an integrated plan for fundraising and alumni relations by working closely with the appropriate senior administrators in the Office of Development and Alumni Affairs as well as appropriate administrators in other campus offices and members of the faculty.
- Build and maintain relationships with the Board of Trustees members, other volunteers, and members of the college constituency, both with a fundraising emphasis and for general institutional advancement objectives.
- Identify and maintain a specific list of principal fundraising prospects for continuous cultivation and solicitation for which the Vice President takes personal responsibility.
- Participate as a senior member of the College's administrative team (AEC).
- Provide counsel and support to the President and others in all fund raising and constituent relations efforts.
- Responsible for campaign architecture, leadership, execution and assessment.
- Provide staffing for the Development/Alumni Affairs Committee of the Board and any campaign related committees.
- Recommend and implement College policy and procedures relating to development and alumni relations, including capital campaigns, and/or special mini-campaigns as authorized by the President and Board of Trustees.
- Monitor campus needs for project and program funds and assign development staff as appropriate.
- Represent the President at campus or off-campus functions as s/he finds appropriate.
- Represent the college at appropriate professional and community functions.
- Direct the preparation and submission of the budget for the office of development and alumni relations.
- Contributes to an organization that places a high value on trust and teamwork; emphasizes cooperation and collegiality to foster an exceptionally positive and productive work environment.
- Maintains the highest standards of fiscal, ethical and professional conduct.
- Contributes to building a culture of philanthropy at Allegheny by taking responsibility for other special tasks as requested.

22. The May 26, 2016 job description lists the following as the job's required "Knowledge, Skills and Abilities":

**KNOWLEDGE, SKILLS AND ABILITIES**

- Excellent organizational skills and attention to detail with strong interpersonal and communication (oral, presentation, written) skills are mandatory as is the ability to use tact and sound judgment in all activities.
- The successful candidate will take their work and their colleagues very seriously, but won't take themselves too seriously. A sense of humor is required.
- Demonstrated knowledge of all facets of charitable giving
- The Vice President cares deeply about mentoring gift officers and the development profession, particularly within the field of higher education.
- Strong organizational skills and ability to manage multiple projects simultaneously and independently
- Ability to recruit, motivate, and manage volunteers and donors
- Excellent written and verbal communication skills, including active listening skills and the ability to distill ideas and clarify issues

- Ability to think in creatively conceptual ways, to thin,k analytically and quickly under pressure, and to evaluate complex issues and ideas
- Sensitivity, diplomacy, flexibility and adaptability to balance diverse fundraising demands, goals, needs and staff

     23.     The May 26, 2016 job description lists the "Physical Demand/Work Environment" as:

**PHYSICAL DEMANDS/WORK ENVIRONMENT**

- Able to use computer keyboard extensively. Able to travel significant hours by air through multiple airports and to drive rental automobile. Able to carry and transport 30+ pounds (briefcase with prospect materials, laptop computer, etc.)
- Travel and weekend work required.

The physical demands described herein are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

     24.     The job of Vice President of Development and Alumni Affairs required Plaintiff to travel locally, out-of-state and internationally to meet with donors, potential donors and alumni on a regular basis.

     25.     When traveling by car or plane, Plaintiff was required to carry at a minimum a briefcase and laptop; if traveling overnight, Plaintiff carried a suitcase of varying weights, depending on the length of the trip.

26.     Fifty percent of Plaintiff's time performing the job of Senior Vice President of Development and Alumni Affairs involved traveling locally, out-of-state, and internationally to meet with donors, potential donors and alumni and conduct other business of Allegheny College.

## CLAIM BACKGROUND

27.     Since on or about March 8, 2019, Plaintiff has been disabled as a result of abdominal pain, diarrhea, constipation, Irritable Bowel Syndrome ("IBS"), possible SUDD, hemorrhagic cyst, left knee pain, osteoarthritis of the left knee, chronic fatigue, depression, general anxiety disorder, variable action tremors and functional movement disorder.

28.     When Plaintiff presented a claim for long term disability benefits under the LTD Policy, she was initially found to meet the LTD Policy's definition of "disabled or disability" and began receiving long term disability benefits on September 4, 2019 after receiving six months of short-term disability benefits.

29.     Prior to receiving long-term disability benefits, Plaintiff had sustained a left knee medial meniscus tear that was surgically repaired on February 5, 2019.

## RECORDS AND EVIDENCE IN DEFENDANT METLIFE'S CLAIM FILE PRIOR TO INITIAL DENIAL OF BENEFITS

30.     From March 4, 2019 through March 9, 2019, Plaintiff was an inpatient at The Cleveland Clinic due to abdominal pain and diverticulitis.

31.     On April 3, 2019, Plaintiff saw Dr. Anthony Randolph in her primary care physician's office. She had complaints of left lower quadrant pain, abdominal tenderness and discomfort in her right lower quadrant.  He recommended she be transferred to the emergency room for further evaluation and possible hospitalization.

32.     On April 3, 2019 through April 10, 2019, Plaintiff was admitted to Meadville Medical Center with a diagnosis of UTI with sepsis.  She had two CT scans during her hospital stay which suggested possible ileus versus gastroenteritis.  She was treated with IV antibiotics, fluids and pain control, and her condition improved.

33.     On April 15, 2019, Plaintiff saw Dr. Randolph and he noted that her symptoms of stomach upset had shown improvement, but that "unfortunately [were] still lingering at this time".  Dr. Randolph prescribed Tramadol for pain.  Dr. Randolph also noted Ms. Klein was experiencing diarrhea and he felt the recent antibiotics may be a contributing factor.  He recommended that she follow-up in a week.

34.     On April 29, 2019, Plaintiff was seen by Dr. Randolph and her abdominal pain and generalized weakness was "largely unchanged".  He noted she was continuing to experience diarrhea.

35.     On May 24, 2019, Plaintiff was seen by Dr. Randolph who noted that she was continuing to experience diarrhea.  He noted her thyroid hormone was found to be elevated which was possibly contributing to her diarrhea.

36.     On July 9, 2019, Dr. Randolph noted that Plaintiff had been "very ill for about six months".  He noted that she had lost 90 pounds over several months.  He noted that she had chronic diarrhea and intermittent constipation.  He noted that she was feeling fatigued all the time.  He agreed with her being on disability.

37.     On July 12, 2019, Plaintiff was seen by Dr. Gautman Mankaney, a gastroenterology specialist with the Department of Gastroenterology Digestive Disease Institute at The Cleveland Clinic.  He noted she had been experiencing sharp upper quadrant pain daily which lasts about an hour after she eats.  He also notes that she had diarrhea and constipation.  The doctor's impression

was Plaintiff had a spot on her liver, abdominal pain and constipation and diarrhea.  He suspected Irritable Bowel Syndrome.

38.     On July 17, 2019, Plaintiff had a bone density test which show osteopenia.

39.     On July 18, 2019, Plaintiff had an MRI of her abdomen which showed a hepatic mass consistent with a septated cyst.

40.     On July 18, 2019, Plaintiff had an esophagogastroduodenoscopy (EGD) with Dr. Salem Chowdhry which was normal except for gastric mucosal atrophy.

41.     On August 8, 2019, Plaintiff was seen by Dr. Landefeld, who was in practice with Dr. Randolph.  He noted Plaintiff had hand tremors which had significantly worsened and were interfering with her ADLs.   She was continuing to experience daily fatigue and had issues with her bowels.  On physical exam, it was noted her appearance was "fatigued frail middle aged female with obvious hand tremor."  She had mild diffuse tenderness in her abdomen. Dr. Landefeld diagnosed abdominal pain, fatigue, thyroid nodule, and tremor.

42.     On August 21, 2019, Plaintiff saw Dr. Landefeld who noted Plaintiff continued to have abdominal pain.  He noted she had borderline elevated LFTs (liver functioning tests) and recent labs showed elevated ESR (sedimentary erythrocyte rate).  He noted that she reported that last Thursday she had experiencing sudden very severe and sharp pain bilaterally in her flanks.  On physical examination, her abdomen was diffusely tender to palpation.  His diagnosis was abdominal pain with unknown etiology and significantly elevated ESR and elevated LFTs of unknown etiology.

43.     On September 10, 2019, Plaintiff saw Dr. Landefeld who noted Plaintiff was following up for hand tremors, IBS symptoms with intermittent diarrhea/constipation and fatigue. He noted she had weight loss of 80lbs and had ESR of greater than 100.  On physical exam, she

appeared fatigued and her abdomen remained tender.  His diagnosis remained abdominal pain, fatigue, and tremors.

44.     On September 23, 2019, MetLife had its own nurse review Plaintiff's medical records.  This individual found the medical records supported disability.  This individual noted that Plaintiff had significant ailments which includes diverticulitis, urinary tract infection causing sepsis, abdominal pain and weight loss.

45.     On January 2, 2020, Plaintiff saw Dr. Baggott, a gastroenterology specialist with the Department of Gastroenterology Digestive Disease Institute at The Cleveland Clinic.  He noted her history has been obtained previously by Dr. Mankaney in July 2019 and noted that she continued to have chronic constipation.  He noted that she was taking Dulcolax and Senna if she did not have bowel movements for four days.  He also noted that she continued to have dull left lower quadrant pain.  He noted she had a colonoscopy in August 2019 with reported diverticulosis and two polyps removed.  Dr. Baggott's differential diagnosis for the left lower quadrant pain included SUDD (Symptomatic Uncomplicated Diverticular Disease) versus visceral hypersensitivity.  His differential diagnosis for her constipation included this dyssynergic defecation versus slow transit constipation versus combination.  He noted an MRI of her liver that had shown a hemorrhagic cyst and questioned whether this was contributing to her pain.  He recommended an anorectal manometry.  He suggested an increase in the drug Amitriptyline and a trial with Rifaxinin for possible SUDD.  He recommended she stop medical marijuana, increase Senna plus Docusate.

46.     On or about January 13, 2020, Plaintiff had an ultrasound of her abdomen that showed mildly heterogeneous liver echogenicity.

47.     On January 13, 2020, Plaintiff saw Alan Duignan, a physician assistant in Dr. James Williams' Orthopedic Surgery office at the Cleveland Clinic who recommended an injection to her left knee on January 13, 2020 due to acute left knee pain.

48.     On January 15, 2020, Plaintiff saw Dr. Landefeld who noted that since the diagnosis of diverticulitis in the spring of 2019 and the urinary tract infection with sepsis, Plaintiff had significant medical issues including daily fatigue, depression, worsening tremors and significant GI issues with chronic pain.  He noted that her GI pain was severe and intermittent and had been fairly well evaluated.  He noted that she was seeing a GI doctor at The Cleveland Clinic who was considering a diagnosis of SUDD.  He also noted that she had had an elevated ESR.  Dr. Landefeld in January 2020 diagnosed hyperlipidemia, Hashimoto's disease, gastroesophageal reflux disease without esophagitis, hypothyroidism, and elevated ESR. He continued her prescription for Omeprazole for her GI issues.

49.     After Plaintiff underwent the anorectal manometry at the recommendation of Dr. Baggott on January 21, 2020, she followed up with certified nurse practitioner Meaghan Beal.  Ms. Beal noted that overall, the testing had showed abnormal anal sphincter strength, hyper-acute rectal sensation and abnormal pelvic floor movement.

50.     Plaintiff saw Dr. Ilia Itin, a neurologist, at the CNR-Movement Disorder Clinic at The Cleveland Clinic on January 22, 2020.  He noted that she had been experiencing a worsening of her tremors since the Spring of 2019.  He also noted that she felt achy and sore everywhere.  He noted pain was her biggest problem then, tremors.  He noted she had bought weighted silverware and needed to use two hands to drink.  He noted that stress was making the tremors worse.  He noted that she did lose her balance and had a couple of falls.  His examination noted a "variable action and postural tremor".  His assessment concluded that she was presenting with a combination

10

of chronic pain syndrome, general anxiety disorder, chronic daily headaches and functional movement disorder.  He continued her Fleoxetin, and, added Pristiq and suggested she discontinue Trazadone and Elavil if the Pristiq helped with sleep.

51.     Plaintiff had a virtual visit with Dr. Itin on March 24, 2020.  He noted that she was reported doing about 50% better with the Pristiq and also reported her pain/abdomen pain was 50% better. He recommended increasing the Pristiq to "better address her symptoms".  He also suggested she see a doctor to address her chronic pain.

52.     On April 27, 2020, Plaintiff sent a message to Dr. Itin's office, noting that since she had been off the drug Amitriptyline her pain had increase significantly.  She asked if it was okay to raise her Pristiq prescription to 150mg.  She stated she was having widespread pain and bad headaches frequently.  She noted her mobility was compromised and the pain increased her anxiety.

53.     On or about April 13, 2020, Plaintiff had an MRI of her abdomen that continued to show a cyst with septated in the anterior left lobe of the liver.

54.     On May 4, 2020, Plaintiff had a virtual visit with Ingrid Antall at The Cleveland Clinic. She noted that Ms. Klein had an increase in left lower quadrant pain for several days.  She had a temperature of 100.5.  She noted feeling the same as she did when she had diverticulitis.

55.     On or about May 19, 2020, the Social Security Administration determined upon Plaintiff's initial application that she was disabled as of March 8, 2019.

56.     Plaintiff was also seen by a licensed professional counselor, Ryan Henry, at Mindful Path.  Mr. Henry completed a questionnaire at MetLife's request on August 25, 2020.   In this questionnaire he notes she cannot return to work.  He notes her chronic pain is overwhelming and occurs frequently.  He notes she has an impairment that significantly affects her ability to

control her emotions and to maintain attention, focus and concentration. He notes that anxiety and chronic pain would restrict her ability to work.

## OCTOBER 16, 2020 DENIAL OF LTD BENEFITS

57.     A benefit termination letter from Defendant MetLife dated October 16, 2020 stated, "We have determined that we are unable to approve benefits on your claim beyond October 16, 2020 because you no longer satisfied the definition of disability outlined in the employer's plan." (Exhibit C, October 16, 2020, Denial Letter).

58.     Plaintiff's long term disability benefits were terminated on October 16, 2020 on the basis of a paper review of her medical records by Defendant Metlife's consulting physician Dr. Roger Belcourt.

59.     Dr. Belcourt opined that the evidence suggested Plaintiff "suffers from a medical condition of such severity to warrant the placement of restrictions and limitations on her activities for the time period of beyond 08/19/2020."

60.     Dr. Belcourt found Plaintiff had "impairing" conditions of abdominal pain, diarrhea, constipation and tremors.

61.     Dr. Belcourt found Plaintiff had "disabling" conditions related to abdominal pain from 04/03/2019 until 01/02/2020; tremors from 08/18/2019 until 01/22/2020; and diarrhea from 4/15/2019 until 9/10/2019.

62.     Neither Dr. Belcourt's report nor Defendant MetLife's October 16, 2020 denial letter state there was an improvement or change in Plaintiff's conditions to explain or substantiate why Dr. Belcourt found Plaintiff's abdominal pain was no longer disabling after 01/02/2020; why her tremors were no longer disabling after 01/22/2020; or why her diarrhea was no longer disabling after 09/10/2019.

63.     Dr. Belcourt placed restrictions and limitations on Plaintiff as follows:

> Sitting: unrestricted
> Standing: 30 minutes at a time, up to four hours per day
> Walking: 30 minutes at a time, up to four hours per day
> Lifting: occasionally up to 40 pounds, frequently up to 20 pounds
> Carrying: occasionally up to 40 pounds, frequently up to 20 pounds
> Pushing: occasionally up to 40 pounds, frequently up to 20 pounds
> Pulling: occasionally up to 40 pounds, frequently up to 20 pounds
> Climbing stairs: frequently
> Balancing: frequently
> Stooping: frequently
> Kneeling: frequently
> Crouching: frequently
> Crawling: frequently
> Reaching: unrestricted overhead; unrestricted desk level; unrestricted below waist level
> Use lower extremities for foot controls: unrestricted BLE

64.     Dr. Belcourt stated that these restrictions pertained to the period of time after 08/19/2020 until "reassessment on 12/29/2020." He noted Plaintiff had not reached maximum medical improvement and that a follow-up was indicated for 12/29/20.

65.     Dr. Belcourt stated he did not consider Plaintiff's general anxiety disorder as this would need reviewed by a specialist.

66.     Upon information and belief, Dr. Belcourt was employed by GENEX. GENEX is a company, upon information and belief, that is regularly paid by Defendant MetLife to perform record reviews of long-term disability claimants' medical records and as a result GENEX and its reviewing consultants take a bias approach to reviewing claims which favors Defendant MetLife's termination of benefits.

67.     Defendant MetLife own employee and vocational consultant, Heather Taylor, perform a "OWN OCCUPATION ANALYSIS" on October 5, 2020.

68.    Ms. Taylor performed her "OWN OCCUPATION ANALYSIS" without speaking with Plaintiff about her position as Senior Vice President of Development and Alumni Affairs.

69.    Ms. Taylor's "OWN OCCUPATION ANALYSIS" report directly references the May 26, 2016 job description (attached as Exhibit B to this Complaint).

70.    Ms. Taylor's "OWN OCCUPATION ANALYSIS" report references the job's essential functions lists in the May 26, 2016 job description but fails to consider, reference or note the "Physical Demands/Work Environment" requirements which included the "ability to travel significant hours by air through multiple airports and to drive rental automobiles.  Able to carry and transport 30+ pounds (briefcase with prospective materials, laptop computer, etc.)."

71.    Ms. Taylor's "OWN OCCUPATION ANALYSIS" fails to consider that the LTD Policy language/LTD Plan language provides that "own occupation" is defined as "the essential functions You regularly perform that provide Your primary source of income".

72.    Defendant MetLife and/or Defendant LTD Plan relied on Dr. Belcourt's report and the "OWN OCCUPATION ANALYSIS" of Ms. Taylor to deny the Plaintiff benefits after October 20, 2020.

73.    Defendant MetLife's and Defendant LTD Plan's reliance on Dr. Belcourt's report was unsupported because:

    (a)    Dr. Belcourt with respect to Plaintiff's abdominal pain notes it is an "impairing condition" and cites to medical records that support this finding but arbitrarily and without finding improvement in her pain, concludes the condition is no longer disabling after of 01/21/2020;

    (b)    Dr. Belcourt with respect to Plaintiff's tremors notes it is an "impairing condition" and cites to medical records that support this finding and notes Plaintiff is using weighted silverware and needing to use two hands to drink but arbitrarily and without finding improvement with her

tremors, concludes the condition is no longer disabling after 1/22/20;

(c)     Dr. Belcourt with respect to Plaintiff's diarrhea and constipation notes both were "impairing conditions" and cites to medical evidence that include abnormal anorectal testing in January 2020 to support his finding, but arbitrarily and without finding improvement with her diarrhea, concludes the condition is no longer disabling after 1/22/20;

(d)     Dr. Belcourt with respect to Plaintiff's constipation notes it is an "impairing" condition and cites to medical evidence that include abnormal anorectal testing in January 2020 to support his finding but fails to list constipation as a disabling condition;

(e)     Dr. Belcourt finds no limitations whatsoever in Plaintiff's ability to do fine manipulation or use her upper extremities despite acknowledging a diagnosis of tremors and providing no explanation whatsoever for why Plaintiff had no limitations with fine manipulation and use her upper extremities;

(f)     Dr. Belcourt finds Plaintiff has "impairing conditions" with her diarrhea and constipation but fails to take into consideration how these conditions would affect Plaintiff's ability to remain on task or how often she would need to be in the restroom during a workday;

(g)     Dr. Belcourt admits he did not consider Plaintiff's general anxiety disorder;

(h)     Dr. Belcourt failed to acknowledge Plaintiff's symptoms of fatigue supported by findings of her treating physicians;

(i)     Dr. Belcourt failed to acknowledge Plaintiff's history of left knee medial meniscus tear and continuing left knee pain requiring steroid injections;

(j)     Neither Dr. Belcourt nor Defendant MetLife considered Plaintiff's diagnosis of depression and anxiety.

74.     Defendant MetLife's and Defendant LTD Plan's reliance on Heather Taylor's "OWN OCCUPATION ANALYSIS" was unsupported because:

(a)     the May 26, 2016 job description for the position of Vice President of Development and Alumni Affairs lists the "Physical Demands/Work Environment" of the position but Ms. Taylor did not reference, consider or include these as part of her own occupation analysis;

(b)     Ms. Taylor failed to reference, consider or include the "ability to travel significant hours by air through multiple airports and to drive rental automobiles" or being "[a]ble to carry and transport 30+ pounds (briefcase with prospective materials, laptop computer, etc.)"  when performing the own occupation analysis;

(c)     Ms. Taylor failed to reference, consider or include physical demands of the position of Vice President of Development and Alumni Affairs which the May 26, 2016 job description lists as essential;

(d)     Ms. Taylor's own occupation analysis fails to consider that the LTD Policy language/LTD Plan language provides that "own occupation" is defined as "the essential functions You regularly perform that provide Your primary source of income" and instead referenced and provided a listing from the Dictionary of Occupational Titles as a comparable job when she was bound by the LTD Policy/LTD Plan language to consider the essential functions of how Plaintiff regularly performed her job not how a different  job may or may not be performed in the national economy;

(e)     Ms. Taylor failed to speak with or request information from Plaintiff before performing the own occupational analysis.

## ADMINISTRATIVE APPEAL OF LTD BENEFIT DENIAL

75.     Plaintiff filed an administrative appeal of the long term disability benefit denial on March 11, 2021 when her counsel submitted an appeal letter to Defendant MetLife.

76.     Along with the March 11, 2021 appeal letter, Plaintiff submitted the following records and evidence:

(a)     Dr. Landefeld's report dated 1/15/21 and Dr. Landefeld's records dated 10/26/20
(b)     Dr. Itin's records 3/24/20-8/12/20

(c)   Letter and Mental Health Impairment Questionnaire of Ryan
        Henry, LPC dated 1/27/21
(d)   Meadville Medical Center Records 4/3/19-1/8/20
(e)   Cleveland Clinic records 12/20/18-11/27/19
(f)   Dr. Robert Schwartz record of 10/24/19
(g)   Report of James Primm M.Ed. CRC dated 3/2/21
(h)   Letter of Richard Cook Ph.D dated 2/23/21

77.     Plaintiff submitted medical records not already in the claim file which included records of Dr. Robert Schwartz, a gastroenterologist at UPMC.  Dr. Schwartz saw Plaintiff on October 24, 2019 and diagnosed lower abdominal pain, Irritable Bowel Syndrome with both constipation and diarrhea, and gastroesophageal reflux.  Dr. Schwartz recommended Plaintiff continue with the course of treatment recommended by the Cleveland Clinic.

78.     Plaintiff submitted medical records not already in the claim file which included records of Dr. Itin dated August 12, 2020.  On August 12, 2020, Plaintiff had a virtual visit with Dr. Itin and his records state that since the medication Amitriptyline had been stopped by the medical team, Plaintiff had more diffuse widespread pain, headaches and tremors.  His notes indicate that she was unable to go back to work because of her symptoms.  His treatment plan included Plaintiff having an assessment for her chronic pain syndrome, continuing with Pristiq 100mg and Fluoxetine 40mg once a day and adding at bedtime Mirtazapine 7.5mg.  His diagnosis was chronic pain syndrome, recurrent major depression, anxiety and functional movement disorder.

79.     Plaintiff submitted medical records not already in the claim file which included records of an office visit with Dr. Landefeld on October 26, 2020.  Dr. Landefeld noted Plaintiff's history and the testing she had undergone.  He noted that she had an elevated ESR of 100 and this test remained moderately elevated.  He noted her abnormal anorectal manometry and noted she would like to start physical therapy soon but had not yet done so due to COVID.  He noted that

she was seeing a neurologist and a psychologist at The Cleveland Clinic and her depression medications were being adjusted.  He stated, "she needs to remain on disability due to continued generalized abdominal pain, intermittent diarrhea/constipation, chronic severe fatigue necessitating sleep (10 - 12 hours a night) and intermittent napping during the day".  He diagnosed general abdominal pain, acquired hypothyroidism, mixed hyperlipidemia, depression and anxiety, and unable to do activities due to her disability.  He ordered additional blood work to screen for the Sjogren's antibody.

80.    Plaintiff submitted medical records not already in the claim file which included office records of Dr. James S. Williams, Jr, an orthopedic surgeon at the Cleveland Clinic dated October 30, 2019.  Dr. Williams noted Plaintiff was seen with left knee pain under the kneecap and radiating toward her hip.  On physical examination, she had tenderness to the lateral tibia plateau.  He ordered an MRI and noted he felt that because of her sepsis her osteoarthritis had been aggravated and she had a stress fracture of her left knee.  He recommended she reduce the amount of time on her leg and put her on crutches.

81.    Plaintiff submitted medical records not already in the claim file which included a note of November 13, 2019 from Alan Duignan, a physician assistant with Dr. Williams' office who saw Plaintiff for follow up after her left knee MRI. He noted the MRI had shown post-operative changes, slight progression and articular cartilage abnormalities in the patellofemoral compartment and osteonecrosis without articular surface collapse.  His impression was left knee osteonecrosis without collapse, weakness secondary to chronic illness. He recommended she start physical therapy and progress to weight bearing.

82.    Plaintiff submitted with her appeal a report authored by Dr. Landefeld dated January 15, 2021.  In this report, Dr. Landefeld indicates that his office has been caring for Plaintiff

for approximately three years, and that she had been in fairly good health until the Spring of 2019. He noted that after her admissions to the hospital for diverticulitis and urosepsis, she had become increasing ill with a constitution of symptoms which included severe daily fatigue, chronic abdominal pain of unknown etiology that had been very well evaluated, worsening benign essential tremor, depression, anxiety, intermittent diarrhea and constipation.  He also noted that her fatigue has become overwhelming and that she sleeps 10 to 12 hours at night and also frequently needs to take a nap.  He noted her 90-pound weight loss and her abnormal ESR testing.

83.    Dr. Landefeld's report dated January 15, 2021 also noted that he was aware that Plaintiff worked as a Vice President of Development and Alumni Affairs for Allegheny College, and he noted that this is a very intense job that required frequent travel and flying around the country for fundraising for the college.  He did not feel that she was capable of performing that job in her current state.  He notes that she continued to have "profound fatigue and continues to have daily abdominal pain and cramping".   He notes that because she has good and bad days it would be difficult to perform work.  He also noted that he did not feel that she was capable of even part-time work on a reduced basis.

84.    Submitted with the appeal was a January 27, 2021 questionnaire and cover letter of Mr. Henry, Plaintiff's therapist.  In his cover letter he notes Plaintiff has the following diagnoses: Major Depressive Disorder, Anxiety Disorder, and post-traumatic stress disorder.  He notes her mental health issues have had a significant impact on Plaintiff in that she struggles to follow through and complete tasks.  In the questionnaire he completed, he notes she would be unable to complete a normal workday or workweek without interruptions from psychologically based symptoms nor would she be able to perform at a consistent pace without an unreasonable number and length of rest periods. She would also not be able to deal with work stress.

85.    On or about April 13, 2021, Plaintiff's counsel forwarded to Defendant MetLife the records of Dr. Kasia Rothenberg of the Neurological Institute at The Cleveland Clinic.

86.    Dr. Rothenberg's records included records of Zoom visits with Dr. Rothenberg on September 30, 2020, November 17, 2020 and April 5, 2021.

87.    Dr. Rothenberg's record of April 5, 2021 noted Plaintiff's thought process was slightly circumstantial, and her insight and judgment were limited by cognition.  The doctor's impression was "cognitive disorder due to general medical conditions; minor neurocognitive impairment; chronic pain; major depressive disorder in partial remission and PTSD".

88.    Along with Plaintiff's appeal letter submitted on March 11, 2021, Plaintiff submitted a letter dated February 23, 2021 from Allegheny College's former President, Richard J. Cook, who described the scope and responsibilities of the position of Vice President of Development and Alumni Affairs.

89.    Mr. Cook's February 23, 2021 letter detailed the extent of travel required of the position and that the position normally required "at least half his or her time on the road, often traveling with the President to visit top-level donors and prospects".  He noted from his experience "these trips can be demanding not only in terms of travel schedule but also with pressure for the high stakes involved".  He noted it was common to have multi-day or multi-week visits to two or more locations around the country with packed schedules for efficiency.

90.    Mr. Cook also detailed the mental focus and attention the job required.  He noted the position was "one of the most demanding at any college or university".  The expectations and responsibilities of the position are "multiple, critical and intense".

91.    He noted the position of Vice President of Development and Alumni Affairs staffs the Board of Trustees Development Committee.  The Vice President of Development and Alumni

Affairs is responsible at multi-day Trustee meetings to make presentations and provide data and to engaged in "deep analysis of the numbers".  The position requires a person to be "completely on top of the information, any problems and proposed solutions well in advance".

92.     Also submitted with the appeal was a March 2, 2021 vocational report of James W. Primm, M. Ed., CRC.   Mr. Primm, who reviewed the applicable job descriptions and spoke with Plaintiff, opined that the position required travel over 50% of the year.  He noted that while traveling, Plaintiff would work 14- to 16-hour days, between travel, meetings, dinners and presentations.

93.     Mr. Primm noted that Plaintiff was required to drive 90 minutes to a regional airport.

94.     Mr. Primm described the position as "a skilled occupation" which was a "highly stressful position" responsible for fundraising, campaign structure, leadership and execution.

95.     A letter dated April 12, 2021 from Shaquel Williams at Defendant MetLife was sent directly to Plaintiff's home and was received on or about April 19, 2021.  The letter indicated that, as part of the claim review process, Defendant MetLife had an independent physician consultant review the case.  A report dated April 6, 2021 by Marvin Pietruszka, M.D had been sent to her healthcare providers, Dr. Itin and Dr. Landefeld, for review and comment.  The letter indicated that the healthcare providers should provide a response by April 22, 2021.

96.     On or about April 20, 2021, Plaintiff's counsel received a letter from Defendant MetLife, indicating that they had received the administrative appeal.

97.     On or about April 23, 2021, Plaintiff's counsel received a phone call from Sara Jones at MetLife, indicating that she had taken on responsibility for the appeal.

98.     On or about April 27, 2021, Plaintiff's counsel wrote to Sara Jones at Defendant MetLife,  asking for additional time to respond to the independent consultant's report that had been sent to Plaintiff's treating physicians and asking for a copy of the independent consultant's report.

99.     On or about April 27, 2021, Plaintiff's counsel received copies of letters sent to Dr. Landefeld and Dr. Itin by Ms. Jones at Defendant MetLife, advising the doctors to disregard the independent physician's consultant's report dated April 6, 2021, by Marvin Pietruszka, M.D. which had been sent to their offices on or about April 12, 2021 by Shaquel Williams at Defendant MetLife.

100.     Defendant MetLife did not provide Plaintiff's counsel or Plaintiff with a copy of Dr. Marvin Pietruszka M.D. report that was sent to her physicians by Defendant MetLife's employee Shaquel Williams.

101.     On or about May 3, 2021, Plaintiff's counsel received from Ms. Jones at Defendant MetLife copies of independent consultants' reports of Dr. Jess Ghannam, PhD and Mahdy Flores, D.O. which had been sent to Plaintiff's treating physicians Dr. Rothenberg and Dr. Landefeld for comment.  The healthcare providers were provided 10 calendar days to respond.

102.     On or about May 5, 2021, Plaintiff's counsel wrote to Ms. Jones at Defendant MetLife, indicating receipt of the May 3, 2021 letter which had stated that Defendant MetLife had forwarded to Dr. Rothenberg and Dr. Landefeld two independent physician consultant reports and asked the doctors to provide a response within 10 days.  Plaintiff's counsel asked for a reasonable amount of time for these doctors to respond to the consultant's reports.  Specifically, twenty days from May 3, 2021 was requested.

103.     On or about May 13, 2021, Plaintiff's counsel submitted to Ms. Jones at Defendant MetLife a response from Ryan Henry, LPC to Dr. Ghannam's report.  Mr. Henry noted that he

disagreed with the opinion of Dr. Ghannam.  He noted that he had personally met with Plaintiff for over a year and worked with her on her concerns.  He noted that she has diagnoses of major depressive disorder, anxiety disorder and post-traumatic stress disorder.

104.    On or about May 14, 2021, Plaintiff's counsel sent to Ms. Jones at Defendant MetLife a response of Dr. Landefeld to Dr. Flores' assessment.

105.    Dr. Landefeld had issued a note dated May 14, 2021 in which he stated, "I am writing to express my disagreement with Dr. Flores' assessment that Marjorie is able to hold down a job with restrictions.  She does have a history of chronic fatigue of unknown cause and chronic abdominal pain.  Although a 'clear' diagnosis remains elusive, I firmly feel that this is not a functional issue, and Marjorie does not have any secondary gain.  She did have a weight loss of almost 90 pounds with this illness and also had grossly abnormal labs, including a ESR greater than 100".

106.    Dr. Landefeld further stated:

> "Overall I firmly feel Dr. Flores' assessment of Marjorie is based on the fact that she does not have a clear diagnosis other than chronic fatigue and chronic abdominal pain.  Unfortunately, as is often the case with chronic pain syndromes, she has been exhaustively evaluated.  I do not feel that she is advocating/exaggerating any other symptoms for secondary gain.  I do feel Marjorie is clearly disabled and is unable to be gainfully employed at this time."

107.    On or about May 14, 2021, Plaintiff received from Ms. Jones at Defendant MetLife a letter indicating that on April 29, 2021 Dr. Ghannam amended his original report following a phone call he received from Dr. Landefeld.  The letter indicated, "Since the IPC deferred her assessment to the appropriate specialty, we will forward this new information to Mahdy Flores, D.O.".

108. Enclosed with Ms. Jones' letter May 14, 2021 was a "Physician Consultant Review" form of GENEX, dated April 28, 2021 which included the following addendum:

> Dr. Landefeld identified, at 4/29/2021 9:54 AM, that the claimant has ongoing severe fatigue, is noted to be sleeping 10 to 12 hours per night and needing naps. Claimant also has a recent 90-pound weight loss with increased SED rate, chronic abdominal pain, diarrhea and profound fatigue. Dr. Landefeld identified that the claimant does not have a clear diagnosis and is being worked up for rare diseases. Dr. Landefeld recommends the claimant is unable to work. Respectfully, it does not appear the claimant's diagnosis is limited in the realm of a psychologist to properly opine on, and I defer assessment of the claimant's condition to the appropriate specialty reviewer. From a mental health perspective, the claimant is not documented to be limited.

109. On or about May 18, 2021, Plaintiff's counsel wrote to Ms. Jones at MetLife, indicating she received her letter of May 14, 2021. Plaintiff's counsel advised that Plaintiff did not anticipating submitting any additional information and requested that MetLife make a decision on the appeal.

110. On or about May 27, 2021, Plaintiff's counsel received from Ms. Jones at Defendant MetLife a letter indicating that MetLife needed more time to review Plaintiff's appeal and reach a decision and that a final decision could be expected by July 19, 2021. The letter indicated that additional time was needed because of the following special circumstances:

> The independent physician consultants (IPC) is currently reviewing the responses stated by Dr. Ryan Henry and Dr. Landefeld. Once of the IPC completed this assessment and will render our decision and will notify you immediately.

111. On or about May 28, 2021, Plaintiff's counsel sent to Ms. Jones at Defendant MetLife a letter indicating her disagreement with the extension of time until July 19, 2021. MetLife failed to follow 29 C.F.R. 2560.503-1(i)(1)(i)(3)(i) and resolve the appeal within 45 days

or with the ability of an additional 45 days under special circumstances.  The appeal had been submitted on March 11, 2021.

112.    On June 10, 2021, Plaintiff's counsel forwarded to Defendant MetLife the response of Dr. Itin to MetLife's independent reviewing physician's reports.  Dr. Itin stated, "I have determined Ms. Klein has a medical need for long-term disability benefits based on her diagnosis of action tremor (G25.2), chronic pain in both knees (M25.561; M25.562; G89.29), trochanteric bursitis of the hips (M70.61; M70.62), and chronic mid line low back pain with sciatica (M54.5; G89.29)".

113.    In response to Dr. Flores' assessment that there was no evidence of a functional impairment from reported tremors, Dr. Itin states that he had diagnosed Plaintiff with action tremor, the severity of which required her to purchase weighted silverware and use both hands when she drinks, among other modifications for safe performance of her ADLs and IADLs.  Dr. Itin also noted that Plaintiff has been diagnosed with bilateral knee pain, lower back pain, and bursitis in bilateral hips, and that her major depression exacerbates her physical disability.

## JULY 21, 2021 DENIAL LETTER OF LTD BENEFITS

114.    On July 21, 2021, Defendant MetLife issued a letter indicating they were upholding the termination of Plaintiff's claim based on the conclusion that the Plaintiff does not satisfy the requirements of the plan. (Exhibit D,  July 21, 2021 Denial Letter).

115.    Defendant MetLife upheld their denial of long-term disability benefits based on paper reviews of Plaintiff's medical records by Mahdy Flores, D.O. and Jess Ghannam, Ph.D.

116.    Both Dr. Flores and Dr. Ghannam were reviewing consultants with GENEX, which was the same entity for which Dr. Belcourt was a reviewing physician.

117.    Upon information and belief, GENEX is a company that is regularly paid by Defendant MetLife to perform record reviews of long-term disability claimants' medical records and as a result it and its reviewing consultants take a bias approach to reviewing claims which favors Defendant MetLife's termination of benefits.

118.    Defendant MetLife had already obtained a report of a consulting physician Dr. Pietruszka after Plaintiff filed her appeal and before they obtained Dr. Flores and Dr. Ghannam's reports and choose to ignore or disregard Dr. Pietruszka's report and failed to provide such report to Plaintiff or Plaintiff's counsel despite a request for such report.

119.    Dr. Flores' report dated April 29, 2021, with addendums dated May 27, 2021 and June 23, 2021, acknowledges Plaintiff's conditions of generalized abdominal pain and IBS, causing diarrhea and pain but rejects all consideration of restrictions and limitations related to these diagnosed conditions because "there is no clear etiology or evident GI-related functional impairment".

120.    Dr. Flores' report acknowledges Plaintiff's chronic pain and chronic fatigue but rejects all consideration of restrictions and limitations related to these diagnosed conditions because "these are not supported without a confirmed etiology".

121.    Dr. Flores' report acknowledges Plaintiff's worsening tremors but rejects all consideration of restrictions and limitations related to the tremors because "there is no evidence of severity on exam that would lead to functional impairment for reported tremors" and because "there is no clear etiology".

122.    Dr. Flores only finds Plaintiff's left knee degenerative joint disease and meniscus injury as impairing conditions.

123.    Dr. Flores, in his report of April 29, 2021, lists the following restrictions which are related to Plaintiff's left knee degenerative joint disease and meniscus injury:

> Sitting: unrestricted;
> Standing: frequently, for up to three hours per day;
> Walking: occasionally, for up to two hours per day;
> Lifting: occasionally, up to 30 lbs. BUE;
> Carrying: occasionally, up to 30 lbs. BUE;
> Pushing: occasionally, up to 30 lbs. BUE;
> Pulling: occasionally, up to 30 lbs. BUE;
> Climbing stairs: occasionally;
> Balancing: occasionally;
> Stooping: occasionally;
> Kneeling: never;
> Crouching: never;
> Crawling: never;
> Reaching: occasionally overhead and below waist level,
> unrestricted desk level BUE;
> Use lower extremities for foot controls: unrestricted RLE,
> occasionally LLE;
> Fine manipulation: unrestricted;
> Simple and firm grasping: unrestricted.

124.    In response to Dr. Flores' report of April 29, 2021, Dr. Landefeld issued a report dated April 14, 2021 in which he noted that he disagreed with Dr. Flores' assessment and that:

> I firmly feel that Dr. Flores' assessment of Marjorie is based on the fact she does not have a clear diagnosis other than chronic fatigue and chronic abdominal pain. Unfortunately, this is often the case with chronic pain syndromes. She has had exhaustive evaluations. I do not feel that she is fabricating/exaggerating any of her symptoms for secondary gain. I do feel that Marjorie is clearly disabled and unable to be gainfully employed at this time.

125.    Dr. Flores added an addendum to her April 29, 2021 report, which is dated May 27, 2021 in which he disagrees with Dr. Landefeld. Dr. Flores disagrees that Plaintiff is "unable to work attributable to GI symptoms, fatigue or other etiology, as there is no documentation of a comprehensive fatigue panel (symptoms are self-reported)".

126.   Dr. Flores did not raise an allegation of the need for a "comprehensive fatigue panel" in his April 29, 2021 report that was provided to Dr. Landefeld nor was his addendum note provided to Plaintiff or Plaintiff's counsel until the issuance of the July 21, 2021 denial letter. Neither Dr. Landefeld nor the Plaintiff has had an opportunity to respond to such a contention.

127.   It is widely recognized in the medical and legal fields that chronic fatigue is a disease that has no known etiology and that there are not definitive lab tests to diagnose this condition.

128.   Dr. Flores inappropriately and arbitrarily rejected Plaintiff's chronic fatigue due to the lack of an established etiology when it is well-established in the legal and medical communities that chronic fatigue has no known etiology.

129.   Dr. Flores inappropriately and arbitrarily rejected Plaintiff's diagnosed conditions of abdominal pain and IBS causing diarrhea when there was objective evidence of GI-related functional impairment.  Such evidence included Plaintiff's hospitalization with diverticulitis in March 2019, abnormal CT scans while hospitalized in April 2019, a 90-pound weight loss, a hepatic cyst as evidenced on MRIs of July 18, 2019 and April 30, 2020, abnormal anorectal manometry testing on January 21, 2020, abnormal ESR on multiple blood tests; abnormal liver function tests; and noted diffuse tenderness of the abdomen on physical exam by treating physicians.

130.   On or about June 3, 2021, Dr. Itin, a neurologist with the CNR Movement Disorder Clinic at The Cleveland Clinic, responded to Dr. Flores' report. Dr. Itin stated that he had diagnosed Plaintiff with action tremors, and the severity required the purchase of weighted silverware and use of both hands to drink among other modalities to safely perform her activities of daily living.

131.    Dr. Itin was not the only treating physician to have observed Plaintiff's tremors, as Dr. Landefeld noted in an office note of August 8, 2019 the Plaintiff had "obvious hand tremors".

132.    Dr. Flores inappropriately and arbitrarily rejected Plaintiff's diagnosed medical conditions of abdominal pain, IBS with diarrhea, constipation, chronic fatigue, chronic pain and hand tremors without physically examining Plaintiff and based on a paper review of medical records.

133.    Defendants MetLife's and Defendant LTD Plan's reliance on Dr. Flores' report was unsupported because:

>    (a)    Dr. Flores rejects any restrictions or limitations related to all Plaintiff's diagnosed medical conditions except her left knee degenerative joint disease and her left medial meniscus injury when no other physician agreed with her conclusions, including Defendant MetLife's prior reviewing physician, Dr. Belcourt, who acknowledged Plaintiff suffered from "impairing conditions" of abdominal pain, tremors, diarrhea and constipation and accepted such conditions were disabling for a period of time;

>    (b)    Dr. Flores rejects any restrictions or limitations relating to all Plaintiff's diagnosed medical conditions except her left knee degenerative joint disease and her left medial meniscus injury even though treating specialists in gastroenterology, neurology and family medicine had concluded that Plaintiff had diagnosed medical conditions which impaired her ability to work;

>    (c)    Dr. Flores failed to acknowledge and/or ignored objective evidence supporting a GI functional impairment which included hospitalization for diverticulitis in March 2019, abnormal CTs while hospitalized April 2019, a 90- pound weight loss, a hepatic cyst as evidenced on MRIs of July 18, 2019 and April 30, 2020, abnormal anorectal manometry testing on January 21, 2020, an abnormal ESR on multiple lab results, abnormal liver functioning tests and diffuse tenderness of the abdomen upon physical exam by treating physicians;

(d)     Dr. Flores fails to acknowledge and/or ignored objective evidence of hand tremors that include medical records that note "obvious hand tremors" and evidence that Plaintiff's hand tremors were of such a severity that she was required to use weighted silverware and hold both hands to drink from a cup;

(e)     Dr. Flores fails to conduct a physical examination of Plaintiff; and

(f)     Dr. Flores' is not a specialist in gastroenterology, neurology or chronic fatigue.

134.    Defendant MetLife failed to have the Plaintiff's records reviewed by an appropriate specialty reviewer and instead relied upon Dr. Flores who lacked the necessary specialty in gastroenterology, neurology or chronic fatigue.

135.    Defendant MetLife also obtained a report of Dr. Ghannam dated April 28, 2021 with an addendum dated June 17, 2021.

136.    On or about May 11, 2021, Plaintiff's treating psychologist, Ryan Henry, LPC, issued a response to Dr. Ghannam's report and stated that he had personally met with the Plaintiff for over a year and worked with her and that she had diagnosed conditions of major depressive disorder, anxiety disorder and post-traumatic stress disorder.  He opined that he was in agreement with Plaintiff's other qualified medical providers that she was unable to work.

137.    On or about July 8, 2021, Defendant MetLife own employee and vocational consultant, Kenneth James, MA, CRC, performed an "own occupation analysis and labor market analysis".  Mr. James used the physical restrictions articulated by Dr. Flores which only placed restrictions on Plaintiff related to her left knee.  Mr. James failed to consider or assess any opinion or evidence presented from Plaintiff's treating physicians.

138.    Mr. James' July 8, 2021 report attaches the May 26, 2016 job description for the position of Vice President of Development and Alumni Affairs.

139.    Mr. James' July 8, 2021 report fails to acknowledge the "Physical Demands/Work Environment" of the position listed in the May 26, 2016 job description that requires the individual to be "able to travel significant hours by air through multiple airports and to drive rental automobiles.  Able to carry and transport 30+ pounds (briefcase with prospective materials, laptop computer, etc.)" and "travel and weekend work required"."

140.    Mr. James' July 8, 2021 report was prepared without speaking with Plaintiff about her position as Senior Vice President of Development and Alumni Affairs.

141.    Mr. James' July 8, 2021 report fails to consider the LTD Policy language/LTD Plan language which provides that "own occupation" is defined as "the essential functions You regularly perform and provide Your primary source of income".

142.    Defendant MetLife's and/or Defendant LTD Plan's reliance on Mr. James' July 8, 2021 report was unsupported because:

(a)    the May 26, 2016 job description for the position of Vice President of Development and Alumni Affairs lists the "Physical Demands/Work Environment" of the position but Mr. James did not reference, consider or include these as part of his own occupation analysis;

(b)    Mr. James failed to reference, consider or include the "ability to travel significant hours by air to multiple airports and to drive rental automobiles" or being "able to carry and transport 30+ pounds (briefcase with prospective materials, laptop computer, etc.)" when performing the own occupation analysis;

(c)    Mr. James failed to reference, consider or include physical demands of the position of Vice President of Development and Alumni Affairs which the May 26, 2016 job description lists as essential;

(d)    Mr. James' own occupation analysis fails to consider that the Policy language/Plan language provides that "own occupation" is defined as "the essential functions You regularly perform that provide Your primary source of

income" and instead referenced and provided a list from the Dictionary of Occupational Titles of comparable jobs when he was bound by the Policy/Plan language to consider the essential functions of how Plaintiff regularly performed her job, not how a different job may or may not be performed in the national economy;

(e)     Mr. James failed to speak with or request information from Plaintiff before performing the own occupation analysis.

## COUNT I

## DENIAL OF BENEFITS (LTD PLAN)

143.     Pursuant to 29 U.S.C. §1132(a)(1)(B), the Plaintiff is entitled to bring this action to recover benefits due her under the terms of the LTD Policy and/or LTD Plan and to enforce her rights under the terms of the LTD Policy and/or LTD Plan or to clarify her rights to future benefits under the terms of the LTD Policy and/or LTD Plan.

144.     Plaintiff was a participant in the LTD Plan that provided long-term disability benefits.

145.     Plaintiff submitted medical information confirming the continuation of her disability and her inability to perform the substantial and material duties of her occupation and any other occupation due to continuing health and medical problems.

146.     At all relevant times, Plaintiff has been disabled within the meaning of the LTD Policy and/or LTD Plan.

147.     The Defendant MetLife and/or Defendant LTD Plan improperly denied Plaintiff her benefits in the following manner:

(a)     It/they failed to acknowledge the findings of Plaintiff's treating physicians who indicated Plaintiff was unable to work;

(b)     It/they selectively and improperly relied upon their own physicians' opinions even when their physicians' opinions

were inconsistent with one another and with the treating physicians' opinions;

(c)   It/they failed to take into account the medical records of Plaintiff's treating physicians;

(d)   It/they failed to take into account abnormal findings on medical testing, including but not limited to hepatic cyst as evidenced on MRIs of July 18, 2019 and April 30, 2020, abnormal anorectal manometry testing on January 21, 2020, and abnormal ESR on multiple blood tests and abnormal liver function testing;

(e)   It/they and their own reviewing physicians failed to consider required travel, stress, high concentration and attention to detail, long hours and weekend work all required of the executive level position which were essential parts of Plaintiff's "own occupation";

(f)   It/they and their own reviewing physicians failed to address whether Plaintiff had the ability to perform "significant" travel by car and air and to carry 30+ pounds while traveling as well as whether she had the ability to maintain attention, concentration, remain on task for long hours, perform weekend work, attend meetings with donors and potential donors, prepare and make presentations to Board of Trustees and manage those she supervised and work without significant breaks due to GI issues, fatigue and pain;

(g)   It/they accepted their own reviewing physician, Dr. Flores' opinions when Dr. Flores rejected any impairment or restrictions related to Plaintiff's medical conditions except restrictions related to her left knee even when Plaintiff had diagnosed medical conditions confirmed by specialists in the fields of gastroenterology, neurology and family medicine;

(h)   It/they accepted their own reviewing physician, Dr. Flores' opinions which rejected any impairment or restrictions related to Plaintiff's medical conditions except restrictions related to her left knee even when their prior reviewing physician Dr. Belcourt found Plaintiff suffered from "impairing conditions" of abdominal pain, tremors, diarrhea and constipation and accepted such conditions were disabling for a period of time;

(i)     It/they failed to provide any explanation in their denial letter for why it/they concluded Dr. Flores' assessment was more appropriate than Plaintiff's treating physicians' assessments;

(j)     It/they failed to consider the limitations and restrictions posed by Plaintiff's diagnosed medical condition of abdominal pain and IBS causing diarrhea and constipation, chronic fatigue and hand tremors;

(k)     It/they terminated her benefits without evidence of a change or improvement in her physical health and/or when there was no new evidence to refute the findings of treating physicians;

(l)     in failing to consider if Plaintiff could travel, engaged in meetings with donors, potential donors, the College President, College administrators, Board of Trustee members when abdominal pain and IBS causing diarrhea and constipation, and/or chronic fatigue would interfere with her ability to perform such tasks without significant breaks due to GI issues, fatigue and pain;

(m)     in failing to consider if Plaintiff had limitations related to hand tremors which would impact her ability to perform her own occupation;

(n)     in relying on a vocational assessor that conducted an own occupation analysis without speaking with Plaintiff;

(o)     in failing to provide in their July 21, 2021 denial letter any reasoning or analysis to address issues raised by Plaintiff in her appeal letter concerning Plaintiff's inability to work full-time due to fatigue and pain as well as Plaintiff's lack of an ability to sustain concentration and effort on an activity due to her fatigue and pain;

(p)     in summarily dismissing findings of Plaintiff's treating physicians due to an alleged lack of etiology;

(q)     in summarily dismissing Plaintiff's diagnosed chronic fatigue due to lack of etiology when is well established in the medical and legal community that chronic fatigue has no known etiology;

(r)     in summarily dismissing the diagnosis of abdominal pain, IBS with diarrhea, constipation, hand tremors and chronic fatigue in the denial letter of July 21, 2021 when these

diagnoses had not been rejected in the October 16, 2020 denial letter;

(s)     in focusing on finding a means to reduce, by offsets or termination, Plaintiff's benefits rather than acting as a fiduciary who owed a duty of loyalty to Plaintiff;

(t)     basing it/their denial of benefits on a selective review of the medical records as a whole and its/their rejection of medical evidence that supported disability;

(u)     in violating 29 C.F.R. 2560.503 – 1(i)(1)(i),(3)(i), in that it/they failed to request an extension of 45 days to resolve the appeal or resolve the appeal within 90 days of the appeal letter;

(v)     It/they failed to provide a copy of Dr. Marvin Pietruszka's report to Plaintiff's counsel;

(w)     It/they obtained a report from Dr. Marvin Pietruszka, sent it to Plaintiff's treating physicians then told them to disregard the report but provide Plaintiff with no explanation why Defendant MetLife no longer wanted the doctors to comment on Dr. Pietruszka's report;

(x)     upon information and belief, in selectively choosing their consulting physicians in that it/they switched consulting physicians after the appeal process began; and/or

(y)     It/they evaluated the medical evidence in a biased manner.

148.    The Defendants denied the Plaintiff's claim in violation of the Policy/Plan documents.

WHEREFORE, Plaintiff demands judgment against Defendant MetLife and/or Defendant LTD Plan:

(a)     For the amount of all long-term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest;

(b)      Clarifying and declaring that the LTD Plan is obligated to pay Plaintiff long-term disability benefits in the future as required by the LTD Policy and/or LTD Plan;

(c)      To place Plaintiff in the position she would have been in had she been paid the full amount of benefits to which she is entitled, including without limitation interest, attorney fees and costs and other losses resulting from Defendant MetLife's and/or Defendant LTD Plan's breach;

(d)      For the costs of this action and Plaintiff's attorney fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. §1132(g)(1); and

(e)      For such other and further relief as may be deemed just and proper by the Court.


Respectfully Submitted,


Dated:  September 20, 2021       By: / s /  Susan A. Meredith
           Susan A. Meredith, Esquire
           PA ID #76767
           E-Mail: smeredith@cbmclaw.com

**CAROSELLI BEACHLER & COLEMAN, LLC**

20 Stanwix Street, Suite 700
Pittsburgh, PA  15222-4802

(412) 391-9860 (Telephone)
(412) 391-7453 (Fax)